524 F.2d 393
 ECONOMIC OPPORTUNITY COMMISSION OF NASSAU COUNTY, INC., Appellant,
v.
Casper WEINBERGER, Individually and in his capacity as
Secretary of the Department of Health, Education
and Welfare, et al., Appellees.
 No. 759, Docket 74-2248.
 United States Court of Appeals,
Second Circuit.
 Argued April 7, 1975.
Decided Aug. 6, 1975.
 
 1
 Charles Tauber, Freeport, N.Y. (Malone, Dorfman & Tauber, Richard H. Waxman, Freeport, N.Y., of counsel), for appellant.
 
 
 2
 Lewis F. Tesser, Asst. U. S. Atty. (David G. Trager, U. S. Atty., Paul B. Bergman, Asst. U. S. Atty., of counsel), for federal appellees.
 
 
 3
 John DeWitt Gregory, Hempstead, N.Y. (Wrenn & Schmid, William J. Cosgrove, Brooklyn, N.Y., of counsel), for appellee Lester Miller.
 
 
 4
 Before FRIENDLY and FEINBERG, Circuit Judges, and LASKER, District Judge.*
 
 
 5
 LASKER, District Judge.
 
 
 6
 Economic Opportunity Commission of Nassau County, Inc. (NCEOC) is a Community Action Agency as defined by 42 U.S.C. § 2790.[1] As the grantee agency for Nassau County, NCEOC is responsible within its territory for implementation of the provisions of the Equal Opportunity Act of 1964, 42 U.S.C. § 2701 et seq. (the Act). Pursuant to 42 U.S.C. § 2795, NCEOC established delegate agencies in eleven target poverty areas in Nassau County. In the Glen Cove area, NCEOC contracted with the Glen Cove Equal Opportunity Council (GCEOC) to serve as its delegate agency and to assume responsibility for the day-to-day supervision of programs funded by NCEOC.
 
 
 7
 The Act provides for a number of special programs to "stimulate actions to meet or deal with particularly critical needs or problems of the poor which are common to a number of communities." 42 U.S.C. § 2809(a). Beginning in 1967, the Glen Cove Child Day Care Center (GCD)[2] operated one such program, Project Headstart, with funds channelled from NCEOC through GCEOC. In March, 1972, GCEOC went into receivership and NCEOC assumed direct supervision over the operation of the Headstart program in Glen Cove. On April 13, 1972 NCEOC applied to the Department of Health, Education and Welfare (HEW) for refunding of the Glen Cove Headstart program for the fiscal year 1972-1973, stating that GCD would be the delegate agency. However, on August 3, 1972, shortly after HEW had approved the application, NCEOC informed GCD that no further Headstart funds would be allocated to it because the structure of GCD's Policy Committee did not conform with HEW guidelines requiring parental participation in local Headstart programs.
 
 
 8
 This suit arises out of NCEOC's decision to defund GCD. After two administrative appeals in which NCEOC's action was overturned, the Office of Child Development (OCD)[3] informed NCEOC that the funds allocated to it which were earmarked for the GCD Headstart program would revert to OCD, that NCEOC's grant would be reduced in a like amount, and that HEW would fund GCD directly. NCEOC then brought this action attacking on several grounds the procedures used by HEW/OCD in deciding the administrative appeals, and challenging the propriety of its direct funding of GCD.
 
 I.
 
 9
 The relevant facts are as follows. On March 16, 1973, the Regional Program Director of OCD, Josue E. Diaz, responded to GCD's request for an appeal from NCEOC's decision and invited it to submit certain materials, including GCD's budget application to NCEOC and any communications between NCEOC and GCD which related to the application. Diaz also asked GCD to specify the reasons it believed NCEOC's determination to defund it was arbitrary or unfair, and to state any other facts it thought relevant. Diaz also wrote to NCEOC on March 16, 1973 and directed it to hold in escrow the Headstart funds allocated to GCD pending the appeal. In addition, he requested NCEOC to submit the same kind of materials which GCD had been asked to submit, including a statement of reasons for its action, and any other material it believed relevant.[4]
 
 
 10
 In response, NCEOC submitted only copies of the correspondence in its files relating to GCD. In August, 1973 Diaz rendered his decision finding NCEOC's action improper for the following reasons:
 
 
 11
 "1. That the EOC of Nassau County, Inc. submitted an application for Program Year 'G' (August 1, 1972 to July 31, 1973), which indicated on the OS 187 (Delegate Agency Summary Information) that the Glen Cove Child Day Care Center, Inc. would be the Delegate Agency operating the Head Start program in Glen Cove. The OCD never gave its approval for any change in the sponsorship or the operation of the Glen Cove program. The denial of refunding of the Glen Cove Agency is a violation of the work program approved for the EOC of Nassau County.
 
 
 12
 2. That the EOC of Nassau County did not provide the Glen Cove Child Day Care Center, Inc. a reasonable opportunity to correct the defects and deficiencies alleged nor did the grantee submit evidence that it provided appropriate technical assistance with respect to the correction of the alleged defects and deficiencies."NCEOC protested Diaz' decision to the Regional Director of OCD, charging that the determination had been tainted by improper considerations and was procedurally defective, and requested plenary review by the Acting Director of OCD, Saul Rosoff. On October 11, 1973 Rosoff informed the parties that he would review Diaz' decision and set forth the procedural course he would follow:
 
 
 13
 "The basis for the decision will be a determination of the reasonableness and fairness with which (NCEOC) acted in denying refunding to (GCD). Unless it is found that (NCEOC) acted arbitrarily and unfairly, the decision to deny refunding will be sustained. In the event that the decision of (NCEOC) to deny refunding is not sustained, it will be possible, among other alternatives, for (GCD) to submit an application to the New York Regional Office for consideration of direct funding as a Head Start grantee. Approval of such an application could result in an appropriate reduction of funds to (NCEOC).
 
 
 14
 The record in this case which I will be reviewing will consist of the following:
 
 
 15
 (1) the written material submitted by (NCEOC) and (GCD) which was forwarded by the New York Regional Office to each party as an enclosure to Mr. Diaz' letter of September 20; (2) any rebuttal to the written material of the other agency described in '1' which (NCEOC) or (GCD) wishes to provide to me, but not later than October 25, 1973; (3) any additional information furnished in response to a specific request by the Acting Director, OCD.
 
 
 16
 Should additional information be requested, there will be an exchange of the information with all parties with an additional period for rebuttal to the new material."
 
 
 17
 Neither GCD nor NCEOC submitted additional materials. On November 12, 1973 Rosoff informed NCEOC that he agreed with Diaz' findings and sustained the determination that the denial of refunding to GCD was arbitrary. He also stated:
 
 
 18
 "In the event that you do not wish to continue as grantee with respect to the (GCD) I will suggest that the Regional Office obtain an application for direct funding from the (GCD) and that the funding of your agency be adjusted accordingly."
 
 
 19
 NCEOC did not respond to this suggestion. On March 11, 1974, the Acting Regional Program Director of OCD, Elaine P. Danavall, informed NCEOC that the funds earmarked for GCD would revert to OCD and that NCEOC's funding would be reduced accordingly; NCEOC then commenced this suit.
 
 II.
 
 20
 In the district court, NCEOC sought declaratory and injunctive relief claiming that (1) Diaz and Rosoff were without authority to render a decision in the dispute between NCEOC and GCD because HEW had failed to prescribe procedures for administrative appeal, as required by 42 U.S.C. § 2944; (2) assuming they did have authority, the administrative proceedings were a nullity because the ad hoc procedures used in considering the appeals were improper and not in accordance with applicable rules and regulations; (3) the decisions of Diaz and Rosoff were not supported by substantial evidence; and (4) HEW acted in excess of its statutory authority, and encroached on NCEOC's authority, in funding GCD directly. The district court rejected these claims and granted defendants' motion for summary judgment dismissing the complaint. On appeal, NCEOC makes essentially the same arguments. We find them to be no more persuasive than did the district judge and, for the reasons set forth below, affirm the judgment.[5]
 
 
 21
 A. Section 604 of the Equal Opportunity Act, 42 U.S.C. § 2944, provides in part:
 
 
 22
 "The Director shall prescribe procedures to assure that (1) special notice of and opportunity for a timely and expeditious appeal to the Director is provided for an agency or organization which would like to serve as a delegate agency . . . and whose application to the . . . community action agency has been wholly or substantially rejected or has not been acted upon within a period of time deemed reasonable by the Director."
 
 
 23
 It is undisputed that HEW had not "prescribed procedures" pursuant to § 2944 at the time of GCD's appeals. Nevertheless, this failure, about which we say more below, does not render the proceedings a nullity, as NCEOC claims. It is plain from the language of § 2944 that its purpose is to provide some measure of consistency in agency procedures. However, § 2944 is not a jurisdictional statute; by its terms, it serves the more limited function "to assure" that appeals from administrative determinations are conducted in a fair and orderly manner. Although the ad hoc procedures utilized by Diaz and Rosoff had not been formally promulgated pursuant to § 2944, the record establishes without qualification that the administrative proceedings involving NCEOC and GCD were in fact conducted fairly.
 
 
 24
 This conclusion is not altered on examination of the specific procedural infirmities alleged by NCEOC. Sections 604(2) and (3) of the Act, 42 U.S.C. § 2944(2) and (3) provide that:
 
 
 25
 "(A)n application for refunding under . . . section 2809 . . . (shall not be denied) unless the recipient agency has been given reasonable notice and opportunity to show cause why such action should not be taken . . .; "
 
 
 26
 and
 
 
 27
 "financial assistance . . . shall not be terminated for failure to comply with applicable terms and conditions unless the recipient agency has been afforded reasonable notice and opportunity for a full and fair hearing."
 
 
 28
 NCEOC argues that it has had an "application for refunding denied" or "financial assistance terminated" because HEW directly funded GCD and that it was entitled to a full hearing in accordance with § 2944(2) and (3) before HEW could properly reduce NCEOC's funding by the amount of GCD's budget.
 
 
 29
 The argument is unpersuasive. NCEOC's funding application was not " denied" nor was its financial assistance "terminated" within the meaning of § 2944(2) and (3). OEO Regulations specify that a reduction of funds amounts to a "denial" only if the recipient's funding is reduced to 80 percent or less of its current level. 45 C.F.R. § 1067.2-4(b). It is undisputed that NCEOC's funding was not reduced to 80 percent as a result of HEW's direct funding of GCD.
 
 
 30
 Moreover, even assuming the applicability of § 2944(2) and (3), and HEW's failure to comply strictly with their requirements, the administrative determinations made by Diaz and Rosoff will not be set aside in the absence of prejudice to NCEOC. Kerner v. Celebrezze, 340 F.2d 736, 740 (2d Cir. 1965), Sun Oil Co. v. F. P. C., 256 F.2d 233, 239 (5th Cir. 1958), 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). There has been no such showing. Indeed, appellant did not claim in the district court that it had been prejudiced by the use of the ad hoc procedures and the record establishes that, in fact, there has been no prejudice. Diaz and Rosoff gave NCEOC ample notice of the possibility that HEW would consider funding GCD itself, and reduce NCEOC's grant accordingly,[6] in the event that NCEOC's own decision to defund GCD was found to be improper. Both Diaz and Rosoff also invited NCEOC to submit a statement or explanation of its position regarding GCD. In response to Diaz' invitation, NCEOC submitted only the correspondence in its file. Even after Diaz had decided the dispute adversely to NCEOC, it submitted no further materials for review by Rosoff. Thus NCEOC was given in full measure the notice and opportunity to be heard required by § 2944.[7] Having failed twice to establish by documentary submissions that there was an issue whose resolution required a hearing, NCEOC cannot now complain that it was error not to hold one.[8] Federal Communications Commission v. WJR, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949); Pan American Petroleum Corp. v. Federal Power Commission, 116 U.S.App.D.C. 249, 322 F.2d 999, 1005 (1963). In effect NCEOC argues that any procedural infirmity results in arbitrary administrative action which must be set aside by a reviewing court. Such a proposition finds no support in the cases.[9] As the court observed in Sun Oil Co. v. F. P. C., supra, 256 F.2d at 239:
 
 
 31
 " . . . an administrative agency is not a slave of its rules. Ad hoc changes may be made and, in proper cases, may be applied retroactively. In a particular case an administrative agency may relax or modify its procedural rules and its action in so doing will not be subjected to judicial interference in the absence of a showing of injury or substantial prejudice." (Citations omitted)
 
 
 32
 See also NLRB v. Monsanto Chemical Co., 205 F.2d 763, 764 (8th Cir. 1953) cited with approval in American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 539, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970).
 
 
 33
 B. NCEOC's next claim is based on HEW's alleged failure to comply with an Instruction issued by the Office of Economic Opportunity. Instruction 6441-1 sets forth the standard of review by OEO where a delegate agency (GCD in the present case) appeals an adverse determination by a community action agency (CAA) such as NCEOC.[10] In relevant part, it provides:
 
 
 34
 "The responsible OEO official shall, whenever possible, decide the appeal before the CAA submits its formal funding request. To maintain the principle of local initiative in community action programs, the responsible OEO official will sustain the action of the CAA unless he finds that:
 
 
 35
 a. the CAA did not give fair and adequate consideration to the rejected applicant's application, or
 
 
 36
 b. the decision of the CAA will have a decidedly adverse effect on the quality of the overall community action program in the local community or would preclude achievement of the objectives of a Special Emphasis program as described in Section 222(a) of the Act.
 
 
 37
 If the responsible OEO official concludes that the CAA did not provide fair and adequate consideration of the application, he shall return it to the CAA with the requirement that it reconsider the application and inform the responsible OEO official in writing of the steps taken to reconsider the application and of the decision reached."
 
 
 38
 It is undisputed that OCD's actions did not conform with the Instruction in that neither Diaz nor Rosoff returned GCD's budget application to NCEOC with directions to reconsider it, upon finding NCEOC's determination to have been arbitrary. Nevertheless, this failure is a slender reed on which to base a finding of lack of fair procedure. There is nothing in the record which suggests either that NCEOC requested the opportunity to reconsider GCD's application or that it would have reached a different conclusion had it done so. Indeed, the facts of record speak loudly to the contrary. On being informed of Diaz' decision, NCEOC did not request that GCD's application be remanded to it, but rather requested that Rosoff review Diaz' determination. When Rosoff sustained his findings and indicated that HEW would fund GCD directly unless NCEOC did so, NCEOC still took no action to have GDC's application resubmitted to it. Instead it commenced this lawsuit. In our view, NCEOC's repeated failure to request a chance to reconsider its own determination amounts to a waiver of any such right it may have had at an earlier stage in this dispute. In any event, HEW's failure to adhere strictly to Instruction 6441-1 cannot be considered a material defect in the procedures followed in the absence of a showing of prejudice to NCEOC.[11]
 
 
 39
 C. NCEOC argues next that the decisions of Diaz and Rosoff were arbitrary because they were not supported by substantial evidence. We do not agree. In Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), the Court set forth the proper standard for judicial review of administrative action under 5 U.S.C. 706(2)(A and stated:
 
 
 40
 ". . . the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."
 
 
 41
 We have considered the record submitted by the parties, as did the district judge, and conclude that the administrative decisions were amply supported by the evidence and that Diaz' findings, which Rosoff sustained, were more than adequately detailed to permit review by this court.
 
 
 42
 D. NCEOC's final claim on appeal, that HEW was without authority to fund GCD directly, is refuted by the language of the Act. Section 222 of the Act, 42 U.S.C. § 2809(a) provides, in relevant part:
 
 
 43
 "Subject to such conditions as may be appropriate to assure effective and efficient administration, the Director may provide financial assistance to public or private non-profit agencies to carry on local projects initiated under such special programs; but he shall do so in a manner that will encourage, wherever feasible, the inclusion of the assisted projects in community action programs, with a view to minimizing possible duplication and promoting efficiencies in the use of common facilities and services, better assisting persons or families having a variety of needs, and otherwise securing from the funds committed the greatest possible impact in promoting family and individual self-sufficiency."
 
 
 44
 It is true, as NCEOC argues, that both the statutory language and the Headstart Policy Manual[12] express a strong preference that Headstart programs be administered through the community action agency and we believe, accordingly, that there must be a substantial showing by HEW that removal of a program from local control is justified. It might have been preferable, in the present case, for Diaz or Rosoff to make specific findings on the question whether it was in fact "feasible" within the meaning of 42 U.S.C. § 2809(a) for NCEOC to fund GCD pending its appeal to the courts. Nevertheless, we cannot say on the record before us that HEW/OCD abused its discretion in directly funding GCD. Diaz put NCEOC on notice at the time he rendered his decision that OCD expected NCEOC to continue as the grantee agency for GCD, that NCEOC was to enter into a contract with GCD for that purpose, and that its failure to do so would result in a reduction of NCEOC's funding. When NCEOC requested that Rosoff review Diaz' determination, Rosoff informed it that OCD would consider direct funding of GCD if Diaz' decision were sustained. On rendering his decision, Rosoff again made clear that "(i)n the event that you do not wish to continue as grantee with respect to the (GCD), I will suggest that the Regional Office obtain an application for direct funding from (GCD) and that the funding of your agency be adjusted accordingly." In the four months between Rosoff's decision and OCD's notice that NCEOC's funding would be reduced, NCEOC gave no indication that it was willing to act as grantee for GCD. In these circumstances, it was not improper for HEW/OCD to fund GCD directly.
 
 III
 
 45
 What we have said so far does not dispose of the more troublesome problem presented by this lawsuit, that is, the prospect of more such suits. The record suggests strongly, if it does not establish, that this case had its beginnings in a local political dispute and acquired its legal clothing somewhat later on. It is true that, in the present case, HEW failed to prescribe the procedures for appeal required by 42 U.S.C. § 2944 and it is certainly unnecessary to state that it ought to carry out its statutory mandate forthwith. Nevertheless, from a functional point of view, we regard the agency action taken here as fairly conducted and amply supported by the record as submitted, and indeed feel strongly that this suit need not have been brought.
 
 
 46
 Judge Friendly's concurring opinion makes a forceful argument that suits of this kind do not belong in the courts at all. We share his concern that such matters are not settled within the administrative family. Experience has demonstrated that the beneficiaries of public programs are not shy to seek review of agency action which substantially affects their rights. Such suits call far more urgently for judicial attention than the present quarrel between two branches of the administrative apparatus. However, we cannot agree with Judge Friendly that inter-agency disputes have no place at all in the courts; clearly cases may arise involving questions appropriate for judicial review, for example claims of funding on a racially discriminatory basis.
 
 
 47
 Moreover, the Economic Opportunity Act and its legislative history[13] show that the intent of Congress in enacting the statute was not merely to provide services for the disadvantaged beneficiaries of the Act, as Judge Friendly states. Another important purpose was to insure:
 
 
 48
 "the maximum feasible participation of residents of the (poor or low-income) areas and members of the groups served, so as to best stimulate and take full advantage of capabilities for self-advancement and assure that those programs and projects are otherwise meaningful to and widely utilized by their intended beneficiaries . . . ."
 
 
 49
 42 U.S.C. § 2781(a)(4). To this end, one-third of the members of the boards of directors of community action agencies must be "representative of the poor in the area served." 42 U.S.C. § 2791(b)(2). And the board must:
 
 
 50
 "be so established and organized that the poor and residents of the area concerned will be enabled to influence the character of the programs affecting their interests and regularly participate in the planning and implementation of those programs . . ."
 
 
 51
 42 U.S.C. § 2791(f)(3). It is evident, therefore, that the community action agencies were intended to be more than mere conduits for money and services to help the disadvantaged; they were actively to foster community self-help. As noted earlier, it was in the course of carrying out this function that NCEOC terminated GCD's funding for its alleged failure to conform to HEW guidelines requiring greater parental participation in the administration of Headstart programs.
 
 
 52
 Given the community development function of agencies such as NCEOC; the strong policy of the act that the funding of local programs be administered on a local basis; and NCEOC's claims that HEW failed to follow the required procedures for appeal and abrogated NCEOC's statutory function by funding GCD directly, we find that NCEOC has met the test for standing. It has asserted interests which fall "arguably within the zone of interests to be protected" by the Act and alleged that those interests have in fact been injured. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 152, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), Comprehensive Group Health Services Board of Directors v. Temple University, 363 F.Supp. 1069, 1092-93 (E.D.Pa.1973).
 
 
 53
 Nor do we agree that the district court should have dismissed the complaint here for lack of jurisdiction. To be sure, the complaint is inartful and oblique in setting forth as the basis of jurisdiction 28 U.S.C. § 1391(e), the venue section which implements 28 U.S.C. § 1361. The latter section gives the district courts jurisdiction of "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." In our view, this is such a case. The complaint alleges that Diaz and Rosoff "lacked the power to render a decision" in the dispute between NCEOC and GCD because HEW had failed to prescribe the procedures which 42 U.S.C. § 2944 clearly requires it to do and that in funding GDC directly HEW "wrongfully usurped the power given solely to (NCEOC)" under the Equal Opportunity Act and Transmittal Notice 70.2. The complaint seeks, among other things, an order enjoining HEW to reinstate to NCEOC the funds which had been originally allocated to it. We find no difficulty in concluding that these allegations can be fairly construed as seeking an order "to compel an officer or employee of the United States or (an) agency thereof to perform a duty owed to the plaintiff." See Frost v. Weinberger, 515 F.2d 57 (2d Cir. 1975) and cases cited there, Leonhard v. Mitchell, 473 F.2d 709 (2d Cir.), cert. denied, 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973), State Highway Commission v. Volpe, 479 F.2d 1099 (8th Cir.) reh. and reh. en banc denied (1973). It is on this point that our analysis differs from that of Judge Friendly.
 
 
 54
 The decision of the district court granting summary judgment dismissing the complaint is affirmed.
 
 
 55
 FRIENDLY, Circuit Judge, concurring that the complaint should be dismissed:
 
 
 56
 I agree that the complaint here should be dismissed. This is not on the ground that plaintiff's case lacks merit, although it doubtless does, but because it should not be in the courts at all. The sole point at issue is whether federal funds devoted to remedying the educational problems of poor children in Glen Cove, Long Island, should be channeled through plaintiff NCEOC, "a community action agency", or directly to defendant GCD, a day care center, as HEW has directed. What we have here, as the majority recognizes, is simply a power struggle between two arms of the State of New York. There is no occasion for a federal court to step in as referee, and established principles require that it should not.
 
 
 57
 In Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972), the Supreme Court summarized its decisions in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), as having ruled "that persons had standing to obtain judicial review of federal agency action under § 10 of the APA where they had alleged that the challenged action had caused them 'injury in fact' and where the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated." Here there is no "injury in fact" in an economic sense; no one suggests that if HEW's order were to be set aside, NCEOC could retain a penny of the federal grant it wants to have restored. The case thus differs totally from that of the private contractor debarred from bidding on government contracts, Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964), or injured by an allegedly unlawful award to another, Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). The district court found injury in fact in an impairment of NCEOC's "planning and administrative function" which means, I suppose, that it can spend less without the grant than with it. This seems to me to be going further than the cases require or than good sense justifies. Similarly I do not think Congress' direction that orderly procedures be established with respect to the denial or termination of community action grants brought community action agencies "within the zone of interests to be protected or regulated." The primary interest of Congress lay in the persons to be benefitted by the programs, not in those who were to administer them. If, as Professor Davis argues, "The only problems about standing should be what interests deserve protection against injury, and what should be enough to constitute an injury", and "Whether interests deserve legal protection depends upon whether they are sufficiently significant and whether good policy calls for protecting them or for denying them protection," Administrative Law Treatise, § 22.00-3 at 722 (1970 Supp.), I perceive no basis here for answering the two latter questions in the affirmative. The courts have enough to do in discharging their manifold new duties of monitoring the welfare state's treatment of its citizens, without taking on the additional chore of deciding disputes solely concerned with selecting which government agency is to spend the money.
 
 
 58
 Perhaps, as Professor Davis also suggests, id. at 722-23, the issue in a case like this can better be dealt with under other rubrics than standing. "The courts," he writes, "should avoid taking over functions of government that are committed to executives or administrators through the law of scope of review, not through the law of standing." As regards this case I would add "the law of unreviewability," 5 U.S.C. § 701(a). Admittedly, 42 U.S.C. § 2944 prescribes only administrative procedures and stops short of judicial review. This, of course, would not be fatal, in view of the growing use of nonstatutory review and judicial recognition of the "presumption of judicial review," see Jaffe, Judicial Control of Administrative Action 336-53 (1965). The "presumption," however, may be rebutted by the nature of the administrative action at issue, the provision of judicial review in closely related sections of the same statute, or other considerations. While the inconsequential nature of the administrative action here at issue argues against the presumption, there is a still stronger indication that Congress did not mean to bring the courts into this area. The Community Action Program and the Adult Education Program were enacted in the same statute, P.L. 88-452, 78 Stat. 508 (1964), the Community Action Program being authorized by Part A and the Adult Education Program by Part B of Title II. Section 217, 78 Stat. 522, contained a provision for judicial review of administrative actions with respect to state adult education plans now found in 20 U.S.C. § 1207. There was no corresponding provision in regard to community action programs. Even the provision, now 42 U.S.C. § 2944, directing the prescription of administrative procedures was not enacted until the Economic Opportunity Act Amendments of 1967, 81 Stat. 715. Nothing in the legislative history of those amendments indicates that, in directing the establishment of these procedures, a new feature introduced by the Senate bill, Congress had any thought of bringing the courts on the scene with respect to grants to community action programs, as it had done from the start with respect to adult education. See Conference Report No. 1012, 90th Cong. 1st Sess., in 2 U.S.Code Cong. & Admin.News, pp. 2571, 2798-99 (1967). While the presence of a statutory review provision for one type of administrative action does not automatically bar judicial review of a closely related type, see Abbott Laboratories, Inc. v. Gardner, 387 U.S. 136, 139-48, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), it raises a question requiring reasoned answer in the Abbott Laboratories case nine pages of the U.S. Reports rather than silent rejection. In Arizona State Department of Public Welfare v. HEW, 449 F.2d 456, 462-64 (9 Cir. 1971), (Duniway, J.), cert. denied, 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972), the court held that the action of Congress in affording a state a right to review of an HEW determination that its public assistance plan failed to conform to federal requirements, 42 U.S.C. § 1316(a)(5) implicitly negated a right to review by beneficiaries although the grant of jurisdiction in another section 1316(a)(3) was "unqualified."
 
 
 59
 Here there is every reason to suppose that Congress meant to go no further than it specifically said. It could hardly have wished the administering agencies to fritter away their energies and money[1] in judicial controversies like this. If it were considering the matter today, it would scarcely wish to create this whole new class of litigation for courts to which it has confided so many more important tasks. Cases of this sort create special problems arising from the fact that grants usually are on an annual basis; judges must either give priority to such cases to the detriment of others or risk that appellate decision will come only when the grant is about to expire.[2] If the issue whether action like this is reviewable were more debatable than I think it to be, a lower federal court should take the path that will avoid an influx of new and unwanted business until Congress or higher judicial authority dictates the contrary. As said in Kuhl v. Hampton, 451 F.2d 340, 342 (8 Cir. 1971):
 
 
 60
 The federal courts are courts of limited jurisdiction created to adjudicate legal causes within their jurisdiction and were not established to mediate any and all types of complaints and alleged wrongs; and they certainly were not established to operate the administrative agencies of government.
 
 
 61
 The plaints of federal judges about excessive burdens are likely to fall on rather deaf ears when we needlessly open the door to disputes between governmental or nonprofit agencies as to which one should get federal funds. Many of our wounds are truly self-inflicted. Apparently we simply cannot bear to forego any opportunity to preserve the imposition of the supposed omniscience of federal judges on what we think to be the ignorance or bias of dedicated and experienced administrators, no matter how rarely the opportunity may be exercised, how little the value or how great the costs. For answer the majority summons up the spectre of funding on a racially discriminatory basis; I suspect the courts will not lack sufficient resourcefulness to be able to deal with such a case under 28 U.S.C. § 1343(3) or otherwise when and if it should arise.
 
 
 62
 Even if this were an appropriate case for nonstatutory review, the plaintiff must show a basis for district court jurisdiction and in this also it has failed. The complaint said only "Jurisdiction of this court is conferred by 5 U.S.C. 702, et seq., and 28 U.S.C. Section 1391(e)." Even if we charitably read the reference to 28 U.S.C. § 1391(e), a venue section, as implicating 28 U.S.C. § 1361 which it implements, neither reference is sufficient.
 
 
 63
 To be sure, the Supreme Court still has not passed on the claim that § 10 of the Administrative Procedure Act, 5 U.S.C. § 702, is an independent grant of jurisdiction, and there continues to be a conflict between and perhaps within some circuits on the point. However, in Aguayo v. Richardson, 473 F.2d 1090, 1101-02 (2 Cir. 1973), after full discussion, we declined to rely on § 10 as an independent grant of jurisdiction. I know of no subsequent development that would dictate a change, see Note, Jurisdiction to Review Federal Administrative Action: District Court or Court of Appeals, 88 Harv.L.Rev. 980, 981-82 n. 13 (1975), and apparently the majority likewise does not.
 
 
 64
 My brothers place district court jurisdiction rather on 28 U.S.C. § 1361. While our decisions on the scope of that statute may not be wholly consistent, we have never read it as covering a case like the present where NCEOC is seeking not a further hearing, as in Feliciano v. Laird, 426 F.2d 424 (2 Cir. 1970), but an order requiring HEW to exercise its discretion otherwise than it has done. The words "in the nature of mandamus" in § 1361 do mean something, very likely what the Supreme Court had said only four years before the statute was passed, Panama Canal Co. v. Grace Line Co., Inc., 356 U.S. 309, 317-18, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958). The Senate Report stated that "The purpose of the amendments is to provide specifically that the jurisdiction conferred on the district courts by the bill is limited to compelling a Government official or agency to perform a duty owed to the plaintiff or to make a decision, but not to direct or influence the exercise of discretion of the officer or agency in the making of the decision." U.S.Code Cong. & Admin.News, p. 2784 (87th Cong., 2d Sess. 1962). At most that would go only so far as requiring HEW to conduct a new hearing, but realistically that is not what plaintiff wants.[3]
 
 
 65
 In the course of rejecting a contention by the federal defendants that the complaint sought a judgment against the United States for more than $10,000 and thus was within the exclusive jurisdiction of the Court of Claims, 28 U.S.C. §§ 1346(a)(2) and 1491, on the ground that "The 'basic claim' in the instant case is not 'for money due or ultimately to become due from the United States', but rather for control over the administration of funds already earmarked for a specific program," the district court rather casually advanced the general federal question statute, 28 U.S.C. § 1331, as a third possible basis for district court jurisdiction. The very argument relied on to defeat the contention as to exclusive jurisdiction of the Court of Claims, namely, that the claim was not for the $76,750 which otherwise would have been added to NCEOC's grant of $1,019,650 for the year beginning August 1, 1974 but for the right to control the spending of the money, likewise prevents satisfaction of the requirement of § 1331 that the "matter in controversy" must exceed the sum or value of $10,000, exclusive of interest and costs an allegation which NCEOC had never made, doubtless since it could not do so in good faith.
 
 
 66
 It is fundamental that in suits for equitable or declaratory relief "the jurisdictional amount is to be tested by the value of the object to be gained by the complainant." Glenwood Light & Water Co. v. Mutual Light, Heat & Power Co., 239 U.S. 121, 125, 36 S.Ct. 30, 60 L.Ed. 174 (1915). The object NCEOC here sought to gain was the right to spend an annual grant of $1,096,400 rather than one of $1,019,650. Since the grant was required to be disbursed for public purposes, it is hard to see what economic loss NCEOC can suffer from the reduction. KVOS, Inc. v. Associated Press, 299 U.S. 269, 278-79, 57 S.Ct. 197, 81 L.Ed. 183 (1936), is very much on point.[4] See also McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); S. S. Kresge Co. v. Amsler, 99 F.2d 503 (8 Cir. 1938), cert. denied, 306 U.S. 641, 59 S.Ct. 582, 83 L.Ed. 1041 (1939); Kheel v. Port of New York Authority, 457 F.2d 46 (2 Cir. 1972).[5] Insofar as the alleged injury to NCEOC consists of a loss of prestige or political power not susceptible of monetary valuation, such items may not be taken into account in determining the qualification for jurisdictional amount. See Kiernan v. Lindsay, 334 F.Supp. 588, 593-94 (S.D.N.Y.1971) (three-judge court).
 
 
 67
 It is true that many have advocated abolition of the jurisdictional amount requirement in suits against federal officers. See Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp.Prob. 216, 220 (1948); ALI, Study of the Division of Jurisdiction between State and Federal Courts § 1311 and pp. 172-76 (1968) (original jurisdiction in all federal question cases); 1 Recommendations and Reports of the Administrative Conference of the United States 169 (1970); Friendly, Federal Jurisdiction: A General View 121-22 (1973). But we must take the statutes as they are and, in the case of a suit like this one, the jurisdictional amount requirement may serve a purpose that I at least had not perceived.[6]
 
 
 68
 I would vacate the judgment of the district court with instructions to dismiss the complaint for want of jurisdiction.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 In pertinent part 42 U.S.C. § 2790 provides:
 "(a) A community action agency shall be a State or political subdivision of a State (having elected or duly appointed government officials), or a combination of such political subdivisions, or a public or private nonprofit agency or organization which has been designated by a State or such a political subdivision or combination of such subdivisions, which
 (1) has the power and authority and will perform the functions set forth in section 2795 of this title, including the power to enter into contracts with public and private nonprofit agencies and organizations to assist in fulfilling the purposes of this subchapter, and
 (2) is determined to be capable of planning, conducting, administering and evaluating a community action program and is currently designated as a community action agency by the Director."
 
 
 [2]
 GCD has operated a federally funded day care center in Glen Cove since 1965. It received its funding from the Office of Economic Opportunity (OEO) until 1969, when the Department of Health, Education and Welfare (HEW) assumed responsibility for Project Headstart. These funds were channelled through NCEOC until the present dispute
 
 
 [3]
 In 1969, the Director of OEO delegated his authority over the Headstart Program to the Secretary of HEW. HEW established the Office of Child Development (OCD) to administer the Headstart Program
 
 
 [4]
 Diaz requested the following materials from NCEOC:
 "1. A description of, or copies of, any communications, written or oral, between the Glen Cove Child Day Care Center, Inc. Board and your Agency regarding their request for delegate Agency status.
 
 
 [2]
 The reasons why your Agency failed to act upon their application
 
 
 [3]
 Any other facts and circumstances which your Agency believes to be relevant to the case."
 
 
 [5]
 The Federal appellees contend that the case is now moot because Headstart programs are funded on a year-to-year basis and the present appeal, which grows out of a dispute over GCD's funding for the fiscal year 1972-73, can have no bearing on funding for the present fiscal year. Accordingly, the federal appellees argue, no effective relief can be granted as to the subject matter of the underlying lawsuit, i. e., allocation of HEW's funds for prior fiscal years. The argument is unpersuasive because the question whether OCD has authority to fund GCD directly, or conversely, whether NCEOC shall act as the delegate agency for Headstart in the Glen Cove area for the present and future years is still very much alive
 
 
 [6]
 For example, on October 11, 1973, Rosoff informed the parties of the procedures to be followed in the appeal requested by NCEOC and stated:
 "In the event that the decision of (NCEOC) to deny refunding is not sustained, it will be possible, among other alternatives for (GCD) to submit an application to the New York Regional office for consideration of direct funding as a Head Start grantee. Approval of such an application could result in an appropriate reduction of funds to (NCEOC)."
 
 
 [7]
 We note in passing that, although the appeals submitted to Diaz and Rosoff arose out of NCEOC's decision to defund GCD, a hearing on the question whether HEW ought to fund GCD directly and reduce NCEOC's funding accordingly would have involved the same factual issues as those decided by Diaz and Rosoff on the basis of written submissions
 
 
 [8]
 NCEOC also contends that at the very least an informal hearing was required under OEO regulations. The contention is based on the provisions of 45 C.F.R. § 1067.2-4(c) that:
 "Before rejecting an application of a recipient for refunding or reducing the refunding within the meaning of paragraph (b) of this section, OEO shall offer the recipient an opportunity to submit written material and to meet informally with an OEO official to show cause why its application for refunding should not be rejected or reduced."
 However, as noted earlier, 45 C.F.R. § 1067.2-4(b) makes clear that the procedures set forth in paragraph (c) apply only where funding is reduced to 80 percent or less of a recipient's current level.
 
 
 [9]
 The cases cited by NCEOC are not to the contrary. In Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) and United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), the administrative decision-making process was conducted in a patently undeliberative manner and prejudiced substantial interests of the complaining party. There is and can be no such claim as to the procedures followed in the present case
 
 
 [10]
 We note, as did the district court, that NCEOC's claim based on Instruction 6441-1, which sets forth the procedures to be followed in appeals to OEO by aspiring delegate agencies is inconsistent with its claim based on § 2944 that the Director of HEW failed to "prescribe procedures" for appeals. The inconsistency is explained, if not resolved, by the fact that although OEO has prescribed in 6441-1 certain procedures for appeals by delegate agencies in programs within its jurisdiction, HEW took over the Headstart Program in 1969 and has not as yet prescribed its own procedures for appeal pursuant to 42 U.S.C. § 2944. In essence, then, NCEOC's argument that HEW failed to utilize proper procedures is based on the alternative grounds that it (a) failed to prescribe procedures under § 2944 and (b) failed to follow procedures promulgated by OEO which HEW was bound to follow
 
 
 [11]
 The Federal appellees contend that in any event Instruction 6441-1 applies by its terms only to financially assisted programs under Title II of the Act "if the assistance is administered by OEO," and does not apply where, as here, the assistance is administered by HEW. We disagree. As noted earlier, OEO delegated the administration of the Headstart program to HEW in 1969. The Memorandum of Understanding between HEW and OEO dated July 6, 1973, which relates to the delegation of Project Headstart, states:
 "4. DHEW shall have the authority to set Head Start performance criteria and to initiate and promulgate policies, regulations, guidelines, instructions, and issuances for the operation of Project Head Start. In carrying out Project Head Start, DHEW may follow or, subject to prior consultation with the Director of OEO rescind, amend, modify, or otherwise change, in whole or in part, any applicable OEO instruction, regulation, issuance, or guideline as it deems necessary or appropriate."
 The district court found that the quoted language is "clearly permissive" and that consequently HEW was not bound to observe the procedures contained in Instruction 6441-1. We do not find the language as unambiguous as the district court did. Nevertheless, the Memorandum of Understanding does indicate that HEW is not to be rigidly bound by every OEO regulation and instruction in administering the Headstart program and, as noted in the text, there is no showing of prejudice resulting from its non-compliance in this particular instance.
 
 
 [12]
 Transmittal Notice 70.2, which contains material to be added to the Headstart Policy Manual, assigns to the Community Action Agency the function of selecting delegate agencies, such as GCD. However, the provisions of the Notice are silent on the question whether HEW/OCD has the power, in appropriate instances, to override the policy of local control and directly fund delegate agencies
 
 
 [13]
 See 2 U.S.Code Cong. & Admin.News, 88th Cong., 2d Sess. 1964 at pp. 2900, 2909 (H.R.Rep.No.1458); 2 U.S.Code Cong. & Admin.News, 90th Cong., 1st Sess. 1967 at pp. 2428, 2473-74 (H.R.Rep.No.866); Id. at pp. 2571, 2581-82 (Conf.Rep.No.1012); 45 C.F.R. § 1060.1-2
 
 
 [1]
 While we were told at argument, in answer to a question from the bench, that counsel for the agencies in this case were not charging for their services, the action obviously entails governmental expenses of other sorts which, in the long run, decrease the total available for welfare purposes. And counsel in the next case may not be so generous. Indeed if HEW's decision is reviewable, why should they be?
 
 
 [2]
 For an illustration how burdensome litigation of this sort can be, see the opinion of 13 printed pages in Gaines v. Martinez, 353 F.Supp. 780 (N.D.Texas 1972)
 
 
 [3]
 The three cases cited by the majority do not support its conclusion. In Frost v. Weinberger, 515 F.2d 57 (2 Cir. 1975), the sole issue was the right to a trial-type prereduction hearing; obviously the class of all legitimate children of deceased pensioners was not seeking a declaration that there could be no such thing as a genuine illegitimate child of a pensioner. Leonhard v. Mitchell, 473 F.2d 709 (2 Cir.), cert. denied, 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973), involved a demand for information; the defendants either had a duty to disclose this or they did not. State Highway Comm'n v. Volpe, 479 F.2d 1099 (8 Cir. 1973), is even wider of the mark; while § 1361 was urged by plaintiffs as a jurisdictional basis for that suit, the court declined to rely on that section, holding instead that jurisdiction would be grounded in the general federal question statute, 28 U.S.C. § 1331(a), (the required jurisdictional amount having been satisfied), even though this section was not pleaded. 479 F.2d at 1104-06
 
 
 [4]
 It is true that in KVOS the defendant "traversed" the plaintiff's allegation of jurisdictional amount. But the defendants here could not have been expected to "traverse" an allegation that plaintiff had never made especially when plaintiff was relying on jurisdictional statutes that required no amount in controversy and was actually disclaiming that more than $10,000 was at issue
 
 
 [5]
 Contrast Gonzalez v. Freeman, supra, 334 F.2d at 573, where the complaint of a debarred contractor alleged that profits on the lost business exceeded $100,000
 
 
 [6]
 There is probably little need to fear that a holding of lack of federal jurisdiction would throw cases like these into the state courts. See Hart & Wechsler, supra, Note on Tarble's Case and State Court Proceedings against Federal Officials, 427-31; 1 Moore, Federal Practice P 0.6(5)(2d ed. 1964). If lack of state jurisdiction has the result that the plaintiff here would have no remedy, that, in the present limited context, means only that the combination of failure to meet the federal jurisdictional amount requirement and lack of state power has the happy consequence of accomplishing indirectly what would be better produced by holding that HEW's action was not subject to judicial review